STATE of Wisconsin, Plaintiff-Respondent,†

v.

Michael LOCK, Defendant-Appellant.

Court of Appeals

*No. 2012AP1514–CR. Submitted on briefs February 26, 2013.
—Decided May 7, 2013.*

2013 WI App 80

(Also reported in 833 N.W.2d 189.)

† Petition to review filed.

337

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Amelia L. Bizzaro* of *Bizzaro Law LLC,* Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas J. Balistreri,* assistant attorney general, and *J.B. Van Hollen,* attorney general.

Before Curley, P.J., Fine and Brennan, JJ.

¶ 1. BRENNAN, J. Michael A. Lock appeals from a judgment entered following a jury's verdict, convicting him of one count of conspiracy to pander, one count of conspiracy to solicit prostitutes, four counts of pandering as party to a crime, and four counts of soliciting prostitutes as party to a crime. He also appeals from the circuit court's order denying his postconviction motion.[1] He argues that: (1) the circuit court erred when it adopted the State's brief as its decision when denying Lock's postconviction motion; (2) the fourteen-month interruption in this case while Lock was held on a federal detainer violated his constitutional right to a speedy trial; (3) counts one and two are multiplicitous; and (4) prosecutorial misconduct denied him due process. We disagree with Lock and affirm.

## BACKGROUND

¶ 2. In 2007, Lock found himself at the center of several major state and federal criminal investigations.

---

[1] The Honorable Jeffrey A. Conen entered the judgment of conviction, while the Honorable Dennis P. Moroney entered the order denying Lock's postconviction motion.

In total, Lock faced multiple felony charges in four different cases in two jurisdictions. The State filed its first complaint against Lock in July 2007, charging Lock with racketeering, kidnapping, and possession of cocaine with intent to deliver. The same day, the United States Attorney's Office filed a complaint against Lock in federal court, alleging twenty counts of wire and mail fraud; the grand jury indicted Lock the following month. Two months after the federal indictment, in October 2007, the State filed its second complaint against Lock, charging him with two counts of first-degree intentional homicide. The State's first two cases against Lock were eventually consolidated and the racketeering charge was dropped.

¶ 3. In December 2007, the State filed its third complaint against Lock, charging Lock, Shalanda Lock (Lock's wife), and Migdalia Smith with the ten counts in this case: one count of conspiracy to pander, one count of conspiracy to solicit prostitutes, four counts of pandering as party to a crime, and four counts of soliciting prostitutes as party to a crime. It is the State's third case against Lock, the prostitution-ring case, that forms the basis for this appeal.

¶ 4. In July 2008, the State tried Lock on the homicide, kidnapping, and drug charges. The jury found Lock guilty on all counts, and the circuit court sentenced him to two consecutive life sentences for the homicides, plus fifteen years bifurcated for the kidnapping, to be served consecutive to a seventeen-year sentence for the drug charge. At the same time, Lock's federal case moved forward. The motion practice there was extensive on both sides.

¶ 5. In the meantime, Lock and his co-defendants continued to battle the charges in this case, filing multiple pretrial motions. Not all of the motions were

filed by Lock; Lock adopted the motions filed by his co-defendants. Among these, Lock challenged the charges as multiplicitous. The circuit court issued a written decision denying the majority of the defense motions, including the motion challenging the charges as multiplicitous, and scheduled an evidentiary hearing on the remaining motions. Lock also later claimed a violation of his right to a speedy trial, which the circuit court rejected.

¶ 6. At trial, the State's theory of prosecution was that Lock, with his wife Shalanda, ran a prostitution ring that stretched from Milwaukee to Nebraska. The State alleged that the two recruited prostitutes, transported them to strip clubs, and profited handsomely. The defense argued that the State's witnesses were using Lock as a get-out-of-jail-free card, exchanging their testimony for concessions on their related criminal charges. Lock alleged that Shalanda was at the center of the ring and that he did not know what she was up to or how she earned the money she deposited into their joint accounts.

¶ 7. At the end of the five-day trial, the jury found Lock guilty on all ten counts. The circuit court sentenced Lock to fifty years of imprisonment concurrent to any prior sentences, comprised of thirty years of initial confinement and twenty years of extended supervision, and entered judgment accordingly.

¶ 8. Lock timely filed a postconviction motion, which the circuit court denied, issuing a short written opinion and adopting the State's brief *in toto*. This appeal follows. Additional facts are included in the discussion section as necessary.

341

## DISCUSSION

### I. The circuit court did not err when it adopted the State's brief as its decision denying Lock relief.

██

¶ 9. Lock first argues that the circuit court denied him an independent and neutral evaluation of his postconviction motion because it adopted the State's brief *in toto* as its decision. As a remedy, Lock asks that we reverse and remand the case for a new evaluation of Lock's postconviction motion. We decline his request because he cites no grounds for a remand.

██ ██

¶ 10. A circuit court is not prohibited from adopting the brief of one of the parties as its decision in the case. *Trieschmann v. Trieschmann*, 178 Wis. 2d 538, 544, 504 N.W.2d 433 (Ct. App. 1993). However, if a circuit court chooses to adopt a party's brief, it is required to indicate the factors on which it relied when making its decision and state those on the record. *Id.* The circuit court did so here.

¶ 11. The circuit court did issue a short written order. In it, the circuit court noted with respect to Lock's speedy trial claim that even though the pretrial delay was lengthy, he was not prejudiced by the delay because Lock was already serving two life sentences in the State's homicide case. The court also ruled that the charges against Lock were not multiplicitous because the inchoate conspiracy counts were much broader than the counts charging completed crimes. And finally, the court concluded that there was no proof of prosecutorial misconduct because there was no evidence that the State had a secret agreement to reduce the sentence of

a witness in exchange for his testimony. Such statements adequately set forth the factors the circuit court relied on and complement the State's brief, which the court adopted. *See id.*

■

¶ 12. Furthermore, we note that even if the circuit court's adoption of the State's brief was an error, we are required to disregard any error or defect that does not affect the substantial rights of the losing party. *See* Wis. Stat. § 805.18(1) (2011–12).[2] Here, the three issues Lock raised before the circuit court in his postconviction motion, and which he now argues were given short shrift, are constitutional in nature and will therefore be independently evaluated by this court. *See State v. McDermott*, 2012 WI App 14, ¶ 9 n.2, 339 Wis. 2d 316, 810 N.W.2d 237. As such, any failure by the circuit court to review Lock's claims is inconsequential.

## II. Lock has not shown that he was denied his right to a speedy trial.

¶ 13. Lock argues that his right to a speedy trial was violated by a delay caused by the fourteen months he was in federal custody. He contends that state and federal authorities engaged in a coordinated effort to convict him of multiple crimes, and that there was no reason that the federal government could not have delayed charging him in federal court until his state court cases had concluded. Furthermore, he argues that he was prejudiced by the delay because during the time he was in federal custody the State was able to pressure his co-defendants into cooperating. Lock's arguments

---

[2] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

are not based on evidence and law, but rather on speculation. As such, we affirm.

## A. Relevant Facts.

¶ 14. On November 24, 2008, while the parties were still arguing pretrial motions in the prostitution-ring case before us on review, the federal government took Lock into custody for his week-long trial in federal court, which began December 1. At the time, Lock was in state custody serving his lengthy sentence in the homicide case. The parties agree that Lock remained in federal custody from November 24, 2008, until February 12, 2010, after the conclusion of his federal sentencing hearing. It is this fourteen-month time period, and only this, that Lock argues violated his constitutional speedy trial rights.

¶ 15. In early April 2009, while Lock was in federal custody, the State filed a motion to adjourn the evidentiary hearing on Lock's remaining pretrial motions, having learned that Lock was in federal custody and that the federal government would not release him. According to the State, the federal authorities declined to honor a state court issued writ of *habeas corpus ad prosequendum* to produce Lock for his upcoming state court hearing, and that the United States Attorney's Office and the United States Marshal's Service advised the State that that they would not transfer Lock into state custody until sentencing on his federal crimes was completed. The State alleged that federal statutes and caselaw supported the federal authorities' position that they were not required to release Lock into state custody until his federal sentencing was completed. *See Alabama v. Bozeman*, 533 U.S. 146, 148–49 (2001) (explaining that the anti-shuttling provisions of the

344

Interstate Agreement on Detainers[3] require the receiving state to complete trial proceedings before returning a defendant to the sending state); *see also State v. Eesley*, 225 Wis. 2d 248, 267, 591 N.W.2d 846 (1999) (recognizing that federal institutions may not be compelled to honor state writs of *habeas corpus ad prosequendum*).

¶ 16. Lock objected to the adjournment and sought dismissal of the prostitution-ring case based on the amount of time he was already serving, the amount of time he was facing in federal court, and the fact that the federal sentencing hearing was yet unscheduled. Lock argued that any delay was the result of "joint federal-state prosecutions" and should have been anticipated. Because there was no certainty about when the federal litigation would be completed, the state court set a scheduling conference.

¶ 17. The parties returned to state court on July 14, 2009. At that time, Lock was still in federal custody and the federal court had not yet scheduled a sentencing hearing. Lock renewed his motion for dismissal. The circuit court declined to rule on Lock's motion and set the matter over for yet another scheduling conference.

---

[3] As explained by the United States Supreme Court:

Forty-eight States, the Federal Government, and the District of Columbia (all of which, for simplicity, we shall call "States") have entered into the Interstate Agreement on Detainers (Agreement), 18 U.S.C. App. § 2, p. 692, an interstate compact. The Agreement creates uniform procedures for lodging and executing a detainer, *i.e.*, a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime.

The Agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his

¶ 18. On September 10, 2009, Lock filed a written motion seeking dismissal, which the State opposed. The circuit court held a hearing on October 1, 2009, noting that the prostitution-ring case was no further along than it had been six months earlier in April. The court acknowledged that more than a year had passed since the charges had been filed, and that this triggered a presumption that Lock's constitutional right to a speedy trial had been violated. The circuit court, however, found that the delay was not impermissibly long or entirely the fault of the State. While the federal detainer was the reason for the delay, the court found that Lock could waive the interstate agreement keeping him in federal custody. Because there was "no foreseeable time in which Mr. Michael Lock will be available" so that all of the defendants could proceed to trial together, the circuit court severed Lock's co-defendants' cases.

¶ 19. Lock returned to state custody on February 12, 2010, when the federal sentencing concluded and appeared in person in state court on February 25, 2010, when his trial counsel moved to withdraw because of a conflict. The circuit court ultimately appointed new counsel, and granted Lock's request for an adjournment so that his new attorney could prepare. Nine months later, in September 2010, the jury trial finally took place.[4]

sentence in the sending State. And it seeks to minimize the consequent interruption of the prisoner's ongoing prison term.

*Alabama v. Bozeman*, 533 U.S. 146, 148 (2001).

[4] Lock mistakenly states in his brief that his trial began in October 2010 and that ten months elapsed between the time he was produced in state court and his trial.

## B. Legal Principles and Standard of Review.

¶ 20. "Both the Sixth Amendment to the United States Constitution and article I, section 7 of the Wisconsin Constitution guarantee an accused the right to a speedy trial." *State v. Urdahl*, 2005 WI App 191, ¶ 11, 286 Wis. 2d 476, 704 N.W.2d 324. "Whether a defendant has been denied the right to a speedy trial is a constitutional question that this court reviews *de novo*." *State v. Leighton*, 2000 WI App 156, ¶ 5, 237 Wis. 2d 709, 616 N.W.2d 126. However, we accept any factual findings made by the circuit court unless they are clearly erroneous. *Id.*

¶ 21. To determine whether a defendant's right to a speedy trial has been violated, we consider: "(1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *Urdahl*, 286 Wis. 2d 476, ¶ 11. The right to a speedy trial must be considered based on the totality of the circumstances. *Id.* "Essentially, the test weighs the conduct of the prosecution and the defense and balances the right to bring the defendant to justice against the defendant's right to have that done speedily." *Id.* If a speedy trial violation has occurred, the charges against the defendant must be dismissed. *Id.*

## C. Analysis.

¶ 22. Lock expressly states that he is only challenging the delay caused by the fourteen months he spent in federal custody from November 24, 2008, to February 12, 2010, not the delay caused by the time it

took him and his co-defendants to litigate several motions or the time he requested for his new counsel to get up to speed on the case. The State argues that the law requires us to consider the whole delay when determining whether a defendant's right to a speedy trial has been violated and that Lock cannot selectively pick which parts of the delay he wants us to consider. We need not resolve the parties' disagreement because even if we look only at the fourteen-month delay caused by the federal detainer, we affirm. While the fourteen-month delay was lengthy and while Lock did repeatedly assert his right to a speedy trial, the federal authorities prevented the State from producing Lock in court for his trial until his federal case was resolved and Lock was not prejudiced by the delay because he was already serving several life sentences in the State's homicide case.

¶ 23. Lock correctly argues that the fourteen-month delay was presumptively prejudicial, but that does not end our analysis. *See Green v. State,* 75 Wis. 2d 631, 636, 250 N.W.2d 305 (1977) ("Presumptively, [an] almost twelve-month delay between the preliminary examination and the trial is unreasonable and prejudicial."). In *Green*, despite a twelve-month delay, the Wisconsin Supreme Court concluded that the defendant's speedy trial rights were not violated because the reasons for the delay were not negatively attributable to the State and the defendant incurred no prejudice. *Id.* at 636, 638. We come to a similar conclusion here.

¶ 24. The record here shows that the reason for the delay in this case was the federal authorities' decision not to honor the writ of *habeas corpus ad prosequendum* issued by the state court. While Lock does not dispute that fact, he attributes the federal authorities' actions to the State, arguing that the State and federal authorities were working together to inves-

tigate and convict Lock, that as part of that alliance the State and federal authorities made a strategic decision to bring the cases all at once, and therefore, that the State had control over when the federal government brought its case against Lock. We disagree.

¶ 25. Lock presents no evidence of this alleged joint strategy. Such allegations are pure speculation. He cites to absolutely no evidence in the record demonstrating that the State and federal authorities conspired to delay his trial. The record simply does not support Lock's speculation that the State was responsible for the delay caused by Lock's fourteen months in federal custody.

¶ 26. Furthermore, and most significantly, we agree with the circuit court that Lock was not actually prejudiced by the delay because he was already serving more than two life sentences for his conviction in the State's homicide case. The delay did not *cause* his pretrial incarceration; his homicide sentence would have kept him in prison anyway. While Lock disagrees, arguing that the additional time allotted to the State permitted it to pressure Lock's co-defendants into cooperating, again, his allegations are purely speculative. He presents no evidence that the fourteen-month period contributed in any way to his co-defendants' decisions to testify against him.

¶ 27. Looking at the totality of the circumstances, we conclude that Lock's speedy trial rights were not violated and affirm.

### III. The judgment did not violate Wis. Stat. § 939.72(2) or principles of multiplicity.

¶ 28. Next, Lock argues that: (1) Wis. Stat. § 939.72(2) and principles of multiplicity expressed in *State v. Moffett*, 239 Wis. 2d 629, 239 Wis. 2d 629, 619

N.W.2d 918, prohibit the circuit court from convicting him of both committing a conspiracy and committing the objective of the conspiracy as party to a crime; and (2) he was convicted of both here. He asks us to vacate the conspiracy counts (counts one and two) and remand the case back to the circuit court for resentencing.

¶ 29. Lock's multiplicity argument is underdeveloped. He bases it solely on two things: (1) what he describes as a pretrial concession, by the State, that convictions of the counts in the Information would be multiplicitous; and (2) forfeiture by the State of its appellate argument that the convictions were not multiplicitous. We address and reject both arguments below.

¶ 30. Most significantly, while focusing on what he deems as the State's alleged concession and forfeiture, Lock fails to develop the multiplicity argument. He cites to no caselaw from this state or any other. He mentions that the State relied on *Moffett*, but does not argue from it or cite any language from it. He mentions *State v. Hardison*, 492 A.2d 1009 (N.J. 1985), a case on which the State relied, in his reply brief, but only to distinguish it. He mentions the statute, WIS. STAT. § 939.72(2), in only conclusory terms in his final paragraph, where he makes a glancing reference to the words in the statute, and simply states that the "objective" of the conspiracy of the two challenged counts was the same as the "objectives" of the remaining counts. He cites no examples from the charging documents or evidence in the record to support that conclusion.

¶ 31. The State responds that the plain language and legislative intent behind WIS. STAT. § 939.72(2) is to prohibit conviction of the conspiracy and a crime that may be part of the conspiracy *only where the objective of*

*the conspiracy is limited to the specific crime.* Because here the objective of the conspiracy in counts one and two was to maintain and operate a prostitution ring over several years, and, therefore, was not limited to the soliciting and pandering convictions in counts three through ten, which occurred in one-month periods in 2002, the State argues that the convictions do not violate the statute or multiplicity principles. The State also argues that *Moffett* is distinguishable and that it did not concede or forfeit its multiplicity argument at the circuit court level but fully argued it at the post-conviction hearing. We agree with the State.

¶ 32. The double jeopardy provisions of the Wisconsin and United States Constitutions prohibit multiplicitous charges. *State v. Grayson*, 172 Wis. 2d 156, 159, 493 N.W.2d 23 (1992). Multiplicity occurs when the State charges more than one count for a single criminal offense. *Harrell v. State*, 88 Wis. 2d 546, 555, 277 N.W.2d 462 (Ct. App. 1979). Whether an individual's constitutional right to be free from double jeopardy has been infringed is a question of law that we review *de novo. State v. Anderson*, 219 Wis. 2d 739, 746, 580 N.W.2d 329 (1998).

¶ 33. We apply a two-part test when analyzing multiplicity challenges. *State v. Derango*, 2000 WI 89, ¶ 29, 236 Wis. 2d 721, 613 N.W.2d 833. First, we inquire whether the offenses are identical in law and fact; if so, the offenses are multiplicitous. *Id.*, ¶ 30. Second, if the offenses are not identical, there is a presumption, rebuttable only by clear legislative intent to the contrary, that the legislature intended to permit cumulative punishment for both offenses. *Id.*

351

¶ 34. The plain language of Wis. Stat. § 939.72(2) is consistent with the principles of multiplicity set forth in *Derango. See id.*, 236 Wis. 2d 721, ¶ 28; *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (We first examine the plain words of a statute to determine the legislature's intent.). Section 939.72 states, in relevant part:

> **No conviction of both inchoate and completed crime.** A person shall not be convicted under both:
>
> . . . .
>
> **(2)** Section 939.31 for conspiracy and s. 939.05 as a party to a crime which is the objective of the conspiracy[.]

The statute's plain language prohibits convictions for both conspiracy and being a party to a crime *which is the objective of the conspiracy,* consistent with *Derango's* prohibition against convictions for the same offense. *See id.*, 236 Wis. 2d 721, ¶ 28. Lock's reference to the "objective" of the conspiracy language in his brief indicates that he agrees that the proper analysis here is whether the objective of counts one and two was the same as the objective of the remaining counts. Accordingly, we analyze Lock's arguments regarding both multiplicity and § 939.72 under the test set forth in *Derango.*

¶ 35. Applying *Derango* here we must determine: (1) the objective of Lock's conspiracy in counts one and two; and (2) whether the objective in counts one and two is the same as the objective in counts three through ten.

¶ 36. From the charging documents, we see that counts one and two charged Lock with conspiracy to pander and conspiracy to solicit prostitutes between

January 1998 and September 2003. Counts three through ten charged Lock with pandering and soliciting, as party to a crime, in February 2002 (counts three and four), March 2002 (counts five and six), April 2002 (counts seven and eight), and October 2002 (counts nine and ten). In other words, the objective of the conspiracy in counts one and two was to maintain and operate a prostitution ring from January 1998 through September 2003. The objective of the completed crimes in the remaining counts was limited to one crime, either soliciting or pandering, in February, March, April, or October 2002. As such, the charges in the Information show that the objective of the conspiracy was far broader in time and scope than the objective in the remaining soliciting and pandering counts.

¶ 37. Lock argues in his reply brief that, despite the conspiracy charges' broader timeframe and more extensive scope, there was no evidence at trial to support them, stating that "[a]lthough at trial, the [S]tate generally alleged criminal activity between 1998 and 2003, there was no specific evidence relating to the time period outside of the pandering and prostitution charges."[5] In other words, Lock argues that there was

---

[5] Lock's appellate counsel asserts in the reply brief that "[a]lthough at trial, the [S]tate generally alleged criminal activity between 1998 and 2003, there was no specific evidence relating to the time period outside of the pandering and prostitution charges." She contradicts herself in a footnote to that sentence where she concedes that there was testimony from witness Renee Sikes that she worked as a prostitute for Lock from 2001 to 2002. We conclude that there is ample evidence in the record relating to the time period outside the conspiracy (1998 to 2003) other than those months implicated by the pandering and soliciting charges (February, March, April, and October 2002) and that counsel's "no specific evidence" statement is factually untrue. We caution counsel to take more

no specific evidence presented at trial of a conspiracy outside the acts of February, March, April, and October 2002 that form the basis for counts three through ten. The record belies Locks' assertion:

- Witness Renee Sikes testified that she worked as a prostitute for Lock from late 2001 through early 2002 and that Lock "was in charge of [the] whole [prostitution] operation."

- Witness Amy Watkins testified that she worked for Lock for one and one-half years, and gave Lock a check dated January 28, 2002, and two checks dated January 31, 2002, in the respective amounts of $440, $170, and $515 from her prostitution earnings.

- Witness Carl Davis testified that from 2001 through 2003 he drove the girls working for Lock's prostitution organization and collected their earnings for Lock.

- Witness Alicia Winters testified that she was nineteen years old when Lock recruited her into his prostitution enterprise, in approximately 1998. She gave her prostitution earnings to Lock's wife Shalanda.

- Witness Shalanda Lock testified that she was Lock's wife, that she worked as a prostitute and kept calendar books tracking the enterprise's prostitutes' activities. The books were admitted into evidence. One of the books detailed the prostitution enterprise from 1999 through 2002.

- Witness Cassandra Randle testified that she is Shalanda's mother and that in 2000 she confronted

care in reading the record and to avoid letting good judgment be overtaken by aggressive advocacy, leading to a lack of candor to a tribunal. *See* SCR 20:3.3.

Lock about her daughter prostituting for Lock. She testified that Lock told her to "mind my fucking business and that Shalanda was his and he had her mind, body and soul." He told her that if she went to the police she would not see her grandchildren again.

- Witness Edward Hankins testified that he was Shalanda's brother and that he knew that Shalanda was a prostitute for Lock from 2001 through 2003. He testified that he would go with Lock and Carl Davis to the prostitution sites and collect the money for Lock.

- Witness Milwaukee Police Officer Dean Newport testified that he reviewed Lock's bank account transactions and wire transfers related to Lock's prostitution activities and compared them to the prostitution calendar kept by Shalanda. In doing so, he was able to determine that Lock earned $100,281 from the prostitution ring, not including cash transactions. He testified that Lock received checks from Migdalia Williams, a prostitute who worked for him, dated June 11, 2002, June 15, 2002, June 19, 2002, November 21, 2002, and March 26, 2003; and from Amy Watkins, another prostitute who worked for him, dated January 31, 2002, and January 28, 2002.

¶ 38. Thus, we conclude that both the charging documents and the evidence offered by the State support our conclusion that the objective of the conspiracy counts is broader than the objective in the soliciting and pandering counts.[6] As such, under the first part of the

---

[6] In the final paragraph of his reply brief, Lock argues that adoption of the State's argument that the charges were not identical would require us to improperly conclude that the jury's guilty verdicts on the conspiracy counts were based upon acts that occurred before or after the completed crimes of which Lock was found guilty. If Lock is attempting to raise or develop

multiplicity test, we conclude that the charges are not identical in law or fact and that the State is entitled to the presumption that the legislature did not intend to prohibit conviction for both the conspiracy counts and the soliciting and pandering counts. *See Derango,* 236 Wis. 2d 721, ¶ 30. Because Lock has made no attempt in his appellate submissions to rebut that presumption, we conclude that under the second part of the test, there is no evidence that the legislature intended to prohibit Lock's convictions here and thus the counts are not multiplicitous.[7] *See id.; State v. Gulrud,* 140 Wis. 2d 721, 730, 412 N.W.2d 139 (Ct. App. 1987) (We need not develop a defendant's arguments for him.).

¶ 39. Lock's argument that the State conceded that the counts were multiplicitous is equally unavailing. The State did not concede that the counts were multiplicitous at the pretrial hearing. Rather, the State

a unanimity argument, his attempt is unclear and undeveloped. He never uses the word unanimity nor does he reference the jury's verdicts. Furthermore, he unfairly raises this argument for the first time in his reply brief, thereby denying the State an opportunity to respond, and denying this court a full analysis of the issue by both parties with relevant case and record citations. As such, we will not address the issue. *See State v. Mata,* 230 Wis. 2d 567, 576 n.4, 602 N.W.2d 158 (Ct. App. 1999).

[7] The parties agree that there is no Wisconsin caselaw directly addressing the issues raised in this case. However, our decision is consistent with the reasoning in *State v. Hardison,* 492 A.2d 1009 (N.J. 1985), on which the State relies. Faced with a set of facts and a statute similar to the ones before us, the New Jersey Supreme Court examined whether the conspiracy had "criminal objectives beyond any particular offense committed in pursuance of its goals." *See id.* at 1012. The court noted that if the objective of the conspiracy was the commission of additional offenses, then it was not prohibited, because conviction for the completed offense could not adequately address all of the defendant's conduct. *Id.* at 1013. That is the case here.

simply cited to *Moffett* for two propositions: (1) that WIS. STAT. § 939.72(2) prohibits convictions of both conspiracy under WIS. STAT. § 939.31 and being a party to a crime that is the objective of the conspiracy; and (2) that the State may prevent conviction of both by dismissing a count before submission to the jury or after the jury verdict. The State made no concession specific to Lock's charges. Additionally, Lock fails to note that the State went on to argue at the pretrial hearing that the counts were not identical and hence, not multiplicitous.

██

¶ 40. We also reject Lock's argument that the State forfeited its right to argue on appeal that the counts were not multiplicitous. Even if the State had conceded at the pretrial hearing that *Moffett* prohibited convictions of counts one and two, it is undisputed by Lock that the State argued at the postconviction hearing that the convictions were not multiplicitous. There is no forfeiture where, as here, the circuit court was provided an opportunity to consider those grounds before they were raised on appeal. *See State v. Gilmore*, 201 Wis. 2d 820, 836 n.14, 549 N.W.2d 401 (1996). Additionally, while appellants are limited to the same arguments they made in the circuit court, *State v. Bustamante*, 201 Wis. 2d 562, 571, 549 N.W.2d 746 (Ct. App. 1996), respondents are not, *see State v. Ortiz*, 2001 WI App 215, ¶ 25, 247 Wis. 2d 836, 634 N.W.2d 860. Therefore, we reject Lock's forfeiture argument.

¶ 41. For all of the reasons set forth above, we conclude that the counts on which Lock was convicted are not multiplicitous nor do they violate the prohibitions of WIS. STAT. § 939.72(2), and we affirm.

## IV. Prosecutorial misconduct did not deny Lock due process.

¶ 42. Finally, Lock argues that he was denied due process resulting from prosecutorial misconduct. Specifically, he argues that the State knew or should have known it was going to give witness Edward Hankins credit for his testimony upon Lock's conviction and was therefore obligated to so inform the defense. Because Lock's argument is purely speculative, we affirm the circuit court.

¶ 43. At trial, Hankins was one of the State's key witnesses against Lock. Hankins, who is Shalanda's brother, testified about the inner workings of the prostitution operation. He told the jury that he wanted consideration in exchange for his testimony, but that the State had not promised him anything for testifying. The State later appeared in court on Hankins' behalf asking the court to modify his sentence because he provided valuable testimony against Lock "to his own peril."

¶ 44. Lock argues that Hankins' testimony—that he was testifying without a promise of consideration—while technically true, misled the jury into believing that Hankins had no ulterior motive for his testimony. Because Lock believes that the State knew or should have known that it was going to request the court credit Hankins for his testimony, Lock argues that the State allowed a witness to knowingly give false testimony. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("deliberate deception of court and jury by the presentation of testimony known to be perjured . . . is . . . inconsistent with the rudimentary demands of justice"). Lock's argument is nonsensical.

¶ 45. First, Hankins' motives for testifying were before the jury. He testified that he hoped he would get concessions for his testimony. Lock was free to explore that motive for Hankins' testimony on cross-examination.

¶ 46. Second, there is no evidence to support Lock's unfounded accusation that the State knew that it would grant Hankins concessions for his testimony against Lock. Lock's assertions in that regard are pure speculation.

¶ 47. In sum, Lock has not properly made a claim for prosecutorial misconduct and cannot demonstrate that he was denied due process resulting therefrom. Therefore, we affirm.

*By the Court.*—Judgment and order affirmed.